UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

WILMA MENA, on behalf of her minor child,
C.M.,

                                        Plaintiff,

                    -against-

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: March 31, 2021
```

1:19-CV-06810 (SN)

**OPINION & ORDER**

SARAH NETBURN, United States Magistrate Judge:

Plaintiff, Wilma Mena, on behalf of her minor child, C.M., seeks review of the decision of the Commissioner of Social Security (the "Commissioner") finding that C.M. was not entitled to Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). The parties have cross-moved for judgment on the pleadings. For the reasons stated below, Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED. The matter is REMANDED for further proceedings consistent with this opinion.

## BACKGROUND

### I.   Procedural History

#### A.  Administrative Proceedings

On June 13, 2016, Plaintiff filed an application for SSI on behalf of C.M., her minor child, with an alleged onset date of May 1, 2015. Administrative Record ("R.") at 155–64. After the application was denied, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 90–92. On June 1, 2018, Plaintiff and C.M. appeared before ALJ Deanna L.

Sokolski for a video hearing. R. 32–70. The ALJ issued a decision denying the claim on August

10, 2018. R. 7–29. Plaintiff requested review by Appeals Council, which was denied on May 25,

2019, making the ALJ's decision the final agency decision. R. 1–4.

### B.  Plaintiff's Civil Case

Plaintiff filed the Complaint on July 23, 2019, seeking review of the Commissioner's

decision, pursuant to 42 U.S.C. § 1383(c)(3). See ECF No. 1. On November 6, 2019, the parties

consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). ECF No. 12. On January 2, 2020,

the Commissioner filed the certified administrative record. ECF No. 13. Subsequently, the

parties cross-moved for judgment on the pleadings. See ECF Nos. 14, 23.

## II.  Factual Background

### A.  Non-Medical Evidence

C.M. was born on July 31, 2003, and was between 12 and 15 years old during the

applicable period. See R. 43. She lived with her mother, three siblings, and her grandmother.

R. 48. Her biological father lived in her neighborhood but did not acknowledge her. R. 349.

### 1.  C.M.'s Function Report

Plaintiff completed a function report for C.M. on June 13, 2016. R. 175–86. Plaintiff

indicated that C.M. was limited in communicating with her friends and family. R. 180. She could

not read or write a simple story, add or subtract numbers over 10, or understand money or make

correct change. R. 181. C.M. did not get along with adults or teachers generally and could not

make new friends. R. 183. She could not eat with cutlery, did not pick up her toys or help around

the house, and she did not do as she was told, obey safety rules, go to school on time, or accept

criticism. R. 184. She did not complete tasks or chores. R. 185. Plaintiff wrote that a group of

children physically assaulted C.M. on May 18, 2016, and she had since been very angry and aggressive, had exhibited "loner behavior," and "wish[ed] that she was dead constantly." Id.

### 2. Summary of Hearing Testimony

Both C.M. and the Plaintiff testified at the June 1, 2018 hearing before the ALJ. R. 32–70. First, C.M. testified that she was 14 years old, in the ninth grade, and that school was "bad" and that she had failing grades. R. 43–45. She stated that she had no friends, could not recall her classes, had gotten into trouble for being disrespectful and walking out of class, and had been suspended several times. R. 45–46. She estimated that she missed approximately 80 school days that past year and spent those days walking around the city. R. 46.

C.M. further testified that she did not get along with her mother, siblings, or grandmother because of her anger. R. 48. She did not help with housework but would watch TV or listen to music at home and spent "all" of the day on her cellphone. R. 48–49. She took medications for her mood swings and for sleep, which had been increased, but did not notice consistent results; some days she felt calm, while others she was "out of it." R. 49–50. C.M. testified that her anger was consistent despite therapy—she got into arguments nearly every day, including with her siblings, teachers, and other adults. R. 50–51. She noted that someone she grew up with was killed which had a negative effect on her.[1] R. 52.

Plaintiff testified that C.M.'s behavior changed when she was eleven and a half years old, when she began middle school, and that she had been diagnosed with bipolar disorder and emotional distress. R. 53–54. She shared that C.M. always argued and cursed at her family, and that "everything annoys her." Id. C.M. could not control her anger, was disrespectful, slammed

---

[1] Her mother clarified that a family friend that C.M. considered to be a father-figure was murdered. She also blamed her mother for her biological father's absence and suffered feelings of abandonment. R. 67.

doors, punched walls, and said that she wished that her mother and grandmother were dead. R. 53–54. She indicated that her daughter turned into an "evil" version if told "no," but at other times seemed fine, and appeared unaware of the harm she had previously caused. R. 55. None of C.M.'s siblings had behavioral problems; they were respectful at school and at home, though Plaintiff added that it may be too early to assess her youngest daughter. Id.

Plaintiff stated that C.M. visited a psychiatrist about once per month for a year, who recommend that C.M. take medication, which made her drowsy. R. 55–57. The medications did not appear to be effective at controlling her symptoms, however, and Plaintiff requested that C.M.'s doctor switch to a different medication but was told to "wait just to see." R. 56–57.

Plaintiff confirmed C.M.'s problems with school, attendance, and that she was failing her classes. R. 58. She was unsure if C.M. would be able to pass her tenth grade entrance exams because C.M. indicated that she did not know anything. R. 59. She reported that C.M.'s individualized education program ("IEP") indicated that C.M. could not attend large classes and required two assistants, though she was not provided with a tutor. R. 60.

Plaintiff testified further that C.M.'s teachers complained about her behavior, calling it "unacceptable," and they called school security to remove her from class approximately ten times per month. R. 60–61. She would get suspended one to two times a month. R. 61. The Administration for Children's Services ("ACS") had opened two cases regarding C.M.; both cases accused Plaintiff of harming or allowing C.M. to harm herself, and both were dismissed. R. 59.

Plaintiff also confirmed that C.M. had no friends, noting that a previous group of friends had physically assaulted her, which they broadcast on social media. R. 61. She took C.M. to the doctor for her injuries, filed a police report and a complaint with the school, and asked to have

4

her transferred to a different school; she stated that neither the police nor school took any action. R. 62. Following the assault, it was very difficult for C.M. to trust others or make new friends. Id.

Plaintiff testified that C.M. spent her time in her room watching videos or sleeping. R. 63. She would clean her own room when she felt like it, but not when asked. Id. She could care for her personal hygiene and grooming, but had problems sleeping and would stay awake at night. Id. She did not do her homework and did not engage in any hobbies; she had kickboxed previously but stopped after dislocating her shoulder. R. 64, 66. She went to physical therapy for that injury but reinjured it repeatedly by punching walls and slamming doors. R. 64–65.

**B. Educational Testing**

In January 2016, C.M. was referred to school psychologist Melanie Baez,[2] M.S., for testing with the Weschler Scale of Intelligence Scale for Children ("WISC-IV") and the Kaufman Test of Educational Achievement ("KTEA-3"). R. 244. M. Baez noted that C.M. failed her sixth grade classes, but that she "was described as a student who is capable of completing grade-level content with minimal support" and "was cooperative, responsive and respectful of teachers and peers" during sixth grade summer school. R. 244–45. She noted that C.M. was diagnosed with oppositional defiant disorder and adjustment reaction disorder and was non-compliant with medication. R. 244.

M. Baez noted that C.M.'s behavior and academic performance changed substantially in the seventh grade. Id. In her first marking period, C.M. missed English/Language Arts classroom instruction, did not follow gym class rules or procedures and used disrespectful language, had

---

[2] Because two of the examiners in the record share the surname Baez, they are referred to by their first initial and last name to avoid confusion.

low math scores, needed continued encouragement, required additional academic assistance in science and had inconsistent quality of work, and had excessive absences in social studies. R. 245.

M. Baez assessed that C.M. "did not appear to put forth effort in her responses," and that her assessment results were "not deemed to be a true reflection of [her] abilities" and "should be interpreted with caution." R. 245–46. C.M. showed a full-scale IQ of 42, yielding a 95% confidence interval of 39–50, which fell within the extremely low range, with M. Baez repeating that the "results should be interpreted with caution." R. 246. She indicated C.M.'s apparent lack of effort within specific subtests of the WISC-IV, noting that her working memory performance "is not considered a valid representation of her true ability because of [her] response style and demeanor throughout testing." R. 248. She noted similar caution as to C.M.'s KTEA-3 results. See R. 252.

M. Baez concluded that C.M.'s results merited a disability finding but reiterated that the results should be "interpreted with caution." R. 252.

### C.  Individualized Education Program

From 2016 to 2018, C.M. attended school under an IEP for emotional disturbance that provided her with integrated co-teaching and paraprofessional services, testing accommodations, counseling, and a crisis management plan. R. 219–26, 231, 254. Her first IEP from February 2016, in seventh grade, noted that an intellectual disability ("ID") classification was "considered but rejected because [C.M.'s] adaptive level was considered moderately low and not low" and "the IQ scores obtained from the WISC-V [do] not reflect her true abilities due to her non-compliant nature." R. 268. It also noted that C.M. was believed to have the necessary skill but

that "her emotional/behavioral state interferes with her ability to get credit for completed work or assessed knowledge." Id.

That first IEP noted that she was "socially aware and a natural leader amongst her peers, in that peers gravitate to her and want to be her friend," could "be respectful with selective adults and peers," had a "good sense of humor" and "many friends," and was "liked by her peers," but she "experience[d] difficulty with authority figures and those who place demands on her." R. 256. She did well in the first marking period of seventh grade and was "able to appropriately care for herself throughout the day," could "travel independently between classes," and could "meet her daily living needs similar to same age peers," although she needed to be asked to put away her phone or headphones repeatedly. R. 255. The IEP noted that she would wander and not go to class, but that it was likely due to her "non-compliant nature, and not because she lacks the skill." Id. She scored low on her reading and math assessments and did "little to no work unless encouraged to do so," but noted that she "did well both academically and socially" in summer school the previous year. R. 255.

Her goals included obtaining the ability to deal with frustrating situations like undesired tasks, demands, or peer behaviors, to use coping strategies, and to remain on task for a minimum of ten minutes. R. 260. Special education and counseling were recommended, and C.M. received testing accommodations, including having instructions and questions simplified and read aloud, and increased time. R. 262–63. She would be allowed to pass if she met 30% of her seventh-grade standards in English/Language Arts and Math, and 40% of her eighth-grade standards. R. 266.

C.M.'s subsequent IEPs reported declines in her performance, noting that she had failing or "no show" grades in multiple classes, was absent on 42 occasions, and failed classes "as a

result of sporadic attendance." R. 222, 238. Her "poor and irregular attendance [served] to directly impact her ability to accumulate required credits to graduate," she was "largely unmotivated" when she attended class, and several of her teachers reported "that it is difficult to obtain information regarding academics because [she] presents with so many behavioral challenges that is makes her learning difficult to assess." R. 223–24, 227.

Throughout the 2017–18 school year, when C.M. was in the eighth grade, teachers reported C.M. to be defiant and noted that she "significantly contribut[ed] to a disorderly environment," with a seeming inability to understand the consequences of her "defiant . . . disruptive and insubordinate behavior." R. 222. She cursed at her teachers, threatened a student (who claimed she hit him), punched her knuckles, kicked chairs, and stormed out of the classroom using profanities. R. 222–23. She did not do classwork or homework, and although some teachers noted sporadic attendance, others indicated that she stopped attending altogether. R. 222. A single teacher wrote that C.M. could "be polite and cooperative with adults at times" and if "she is in a good mood she can also engage well with her peers." Id. However, that same teacher described C.M. as "an impulsive and excitable student who is very disruptive" and a "very difficult student who will refuse to work [and] refuse to follow directives," and that it was "often difficult to assess her capabilities because she produces little work and spends so much time off task." Id.

In 2018, the school created a Crisis Management Plan for C.M. R. 219–20. It stated that she had difficulty expressing herself appropriately and that she became upset if she did not receive attention or help immediately and would leave class to escape difficult tasks. R. 219. It determined that she needed to find ways to calm down before her behaviors escalated into tantrums with cursing and verbal threats directed at peers and adults. Id.

### D. Medical Evidence

#### 1. Astor Services for Children & Families

In May 2015, at the age of eleven, C.M. underwent an initial psychiatric assessment by licensed clinical social worker Iliana Baez[3] at Astor Services for Children and Families ("Astor"). R. 400–01. I. Baez reported that C.M. displayed clinically significant behavioral symptoms in response to a stressor, shown by her marked distress in excess of the expected response and significant impairments in her social and academic functioning. R. 400. Specifically, I. Baez noted that C.M. had severe educational problems, evidenced by walking out of class, cursing, arguing with adults, and projecting anger toward male teachers. R. 401. She wrote that C.M. did not have a relationship with her father, was very angry at home, and that she slammed doors and punched walls. Id. I. Baez diagnosed C.M. with adjustment disorder and recommended further assessment to rule out post-traumatic stress disorder. R. 400–401. She assigned C.M. a Global Assessment of Functioning ("GAF") score of 49.[4] R. 401.

At follow-up appointments in May 2015, C.M. reported witnessing someone get shot when she was 11 years old and being emotionally abused by other students. R. 428. She exhibited symptoms of depression, reported anger that had worsened over the last few years, and shared that she had nightmares about the murder of her friend who was "like a father." R. 273. She reported suicidal ideation, anger, rage, and revenge-seeking. R. 274–75. She ideated about

---

[3] This is not the same clinician who administered C.M.'s IQ test, M. Baez.

[4] A GAF score reflects a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text rev. 2000) ("DSM-IV-TR"). A GAF in the range of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 33.

being a danger to herself and others and had passing thoughts of wanting to kill a student the previous year. R. 278.

Mental exams showed that C.M. made good eye contact, was engaged and cooperative during the assessment, had appropriate affect, clear speech, intact cognition, average intelligence, and age-appropriate insight and judgment. R. 420–23. I. Baez opined that C.M. showed behavioral symptoms in response to the killing of her family friend and upon learning who her biological father was. R. 278. She noted C.M.'s marked distress and significant impairment in her social and academic functioning, with severe educational problems, moderate problems with her primary support group, and again assigned a GAF score of 49. R. 403, 405, 424.

That same session, C.M. completed a Suicidal Ideation Questionnaire Jr. ("SIQ-JR") questionnaire assessing the risk of suicide for adolescents. R. 510–11. She reported thinking that it would be better if she were not alive several times per week; thinking of killing herself; wondering what to write in a suicide note; wishing she were dead; thinking that killing herself would solve her problems; wishing she had never been born; and thinking about when she would kill herself. R. 510–11. She scored a 46 on the assessment, indicating an elevated risk of a future suicide attempt.[5] Id.

In June 2015, Dr. Carol Kessler conducted a psychiatric evaluation on C.M. R. 291–301. She noted that C.M.'s stressors included an absent father, a mother with untreated bipolar disorder, the murder of a father figure, and academic underachievement; she reported C.M.'s

---

[5] An SIQ-JR score over 31 indicates an elevated risk of future suicide attempt. Cheryl A. King et al., Adolescent Suicide Risk Screening in the Emergency Department, 16 Acad. Emergency Med. 1234 (2009), https://pubmed.ncbi.nlm.nih.gov/19845554. "An adolescent who scores at or above a raw score of 41 should be referred for further evaluation of potentially significant psychopathology and suicide risk." William M. Reynolds, Suicidal Ideation Questionnaire Score Report, PAR.iConnect at 2 (2013), https://parinc.com/WebUploads/samplerpts/SIQ%20PiC%20Sample%20report.pdf.

anger issues and aggressive behaviors, such as punching doors and walls, and that she made suicidal statements such as wanting to be with her murdered father figure. R. 291. She wrote that C.M.'s mother was concerned for her safety. Id.

Dr. Kessler found C.M. to have average eye contact, average activity, cooperative attitude toward the examiner and her mother, euthymic mood, constricted affect, clear speech, coherent thought process, reality-based thought content, denied suicidal or homicidal ideation, a moderately impaired ability to make reasonable decisions, depression/mood disorder, disruptive behavior, and hopelessness. R. 294–300. She diagnosed C.M. with adjustment reaction and oppositional defiant disorder, with severe educational problems, and clinically significant symptoms, including marked distressed, and significant impairment in social and academic functioning. R. 312. She assigned C.M. a GAF of 49, making the same finding on several other occasions. See, e.g., R. 313, 466.

In July 2015, Dr. Kessler again examined C.M., who reported that she was in regular education in the seventh grade, went to school two to three times weekly and arrived by noon, had trouble paying attention in school, was easily distracted and forgetful, walked out of class, did not do her homework, and did not follow rules. R. 468–69. A mental status exam showed that she had a cooperative attitude, euthymic mood, clear speech, coherent thought process, average intelligence, and intact cognition, but constricted affect, mildly impaired ability to make reasonable decisions, impaired fund of knowledge, and impaired insights. R. 463, 470–73. She also noted impaired insight, difficulty acknowledging the presence of her psychiatric problems, a tendency to blame others for her problems, and poor control of her aggressive impulses. R. 463,

466. Dr. Kessler prescribed Risperdal for treatment,[6] and developed a treatment plan for adjustment disorder and PTSD, with the goal that C.M. perform at school-age level, treat adults with respect, decrease angry outbursts, develop effective coping skills, and learn anger management techniques. R. 433–36, 459.

In August 2015, C.M. was noted to have regular attendance at school and average academic performance, but constant behavior problems. R. 439. I. Baez also noted that C.M. had "kept all scheduled individual therapy appointment[s] as well as medication management appointment[s]." R. 438. She noted that C.M. was disruptive, had angry outbursts, did not follow direction, and was aggressive to others, making similar findings on September 24 and October 1, 2015. See R. 438, 504, 506. In November 2015, I. Baez noted that C.M. had kept all of her scheduled therapy appointments but stopped attending her medication management appointments. R. 443. C.M. appeared "motivated and talkative in sessions which will help [her] achieve her goals in treatment." Id. C.M had been "able to identify what triggers her anger," and worked on "using coping skills to reduce her anger in school." Id.

In January 2016, C.M. visited nurse practitioner David Tambini for medication management. R. 468–76. She reported anger problems, mood swings, and uncontrollable anger, stating that her anger started at age ten, that she got angry every day, and would curse and feel like she was ready to hit someone. R. 468. She mentioned her biological father's absence as something that hurt her and made her mad. Id.

C.M. reported that she was in the seventh grade and had never been held back a grade. Id. She had trouble paying attention in school, walked out of class, did not do homework, was easily

---

[6] "Risperidone [brand name RisperDAL] is used to treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder." Drugs and Supplements: Risperidone (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drg-20067189?p=1 (last updated Mar. 1, 2021).

distracted and forgetful, did not follow rules, argued often, was easily annoyed, and made suicidal statements when angry. R. 469, 474. She had been suspended three times between October 2015 to January 2016 and stayed home from school often. Id. Tambini found her to have a constricted affect, impaired fund of knowledge, a moderately impaired ability to make reasonable decisions, and poor control of her aggressive impulses. R. 471–74.

In February 2016, C.M. scored 17 on the Patient Health Questionnaire (PHQ-9), indicating moderately severe depressive disorder.[7] R. 447. C.M. reported that her interpersonal relationship with her father worsened after she saw him in the neighborhood. R. 447. She also reported making a connection with her therapist (I. Baez) and the dean of her school, who were the only people that could help with her anger. Id. She had been attending school sporadically and arriving late but began attending math. Id. She had not been taking her medication. Id.

In March 2016, C.M.'s mother reported that C.M. took her medication once, stopped, and then took it again on the advice of her pediatrician. R. 477. She also reported that C.M. attended school rarely and spent a lot of time hanging out with a friend. Id. Additionally, she reported that ACS had inquired about C.M.'s absences. Id. Upon testing, C.M. indicated many signs of oppositional defiance disorder ("ODD"), affective problems, somatic problems, oppositional defiance, and conduct problems. R. 478. She was borderline for attention-deficit hyperactivity disorder ("ADHD"), reported little enjoyment, poor concentration, poor appetite, felt that no one loved her, and had poor sleep. R. 478. A mental status exam showed cooperative attitude toward the examiner, angry mood, appropriate affect, clear speech, coherent and logical thought process,

---

[7] Scores on the PHQ-9 range from: 1–4 Minimal Depression; 5–9 Mild Depression; 10–14 Moderate Depression; 15–19 Moderate Severe Depression; and 20–27 Severe Depression. See Kurt Kroenke, MD et al., The PHQ-9: Validity of a Brief Depression Severity Measure, 16 J. Gen. Internal Med. 606 (2001), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268.

intact cognition, average intelligence, appropriate insight, and moderately impaired ability to make reasonable decisions. R. 487–90.

C.M. was tested on the Child Behavioral Checklist ("CBCL/6-18") syndrome scale and had a total problem score over the 98th percentile. R. 520. She scored greater than the 97th percentile (in the clinically significant range) for withdrawal, depression, somatic complaints, thought and attention problems, and aggressive behavior. Id. She scored at the 97th percentile (borderline clinical range) for social problems. Id. She was again in the clinically significant range for affective, somatic, oppositional defiant, conduct problems, and PTSD, and in the borderline clinical range for ADHD and sluggish cognitive tempo.[8] R. 521–22.

In April 2016, C.M. reported that she often skipped school, had difficulty sleeping, and sometimes forgot to take her medication. R. 495–96. She denied fighting with anyone, and said she had fun with friends. R 496. Plaintiff wanted to get a lawyer to help transfer C.M. to a different school, as she felt that the current school administration picked on C.M. Id. She reported that C.M. did not take her Seroquel because she was afraid that she might have seizures, as she had febrile seizures, and that her clonidine medication was not terribly helpful.[9] Id. A mental status exam showed C.M. had a cooperative attitude, average intelligence, appropriate

---

[8] Sluggish Cognitive Tempo ("SCT") is defined by a constellation of symptoms that includes daydreaming, difficulty initiating and sustaining effort, lethargy, and physical underactivity. See Lisa A. Jacobson et al., Sluggish Cognitive Tempo, Processing Speed, and Internalizing Symptoms, 46 J. Abnormal Child Psych. 127 (2018), https://pubmed.ncbi.nlm.nih.gov/28215021/#:~:text= Sluggish%20Cognitive%20Tempo%20(SCT)%20has,%2C%20lethargy%2C%20and%20physical%20un deractivity.

[9] Clonidine is "used alone or together with other medicines to treat attention deficit hyperactivity disorder (ADHD). It works by increasing attention and decreasing restlessness in children and adults who are overactive, cannot concentrate for very long, or are easily distracted and impulsive." Drugs and Supplements: Clonidine (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/clonidine-oral-route/description/drg-20063252 (last updated Feb. 1, 2021).

insight, and moderately impaired ability to make reasonable decisions. R. 497–99. C.M. would say that she wished she were dead when angry but denied suicidal ideation. R. 499.

On May 17, 2016, the day before Plaintiff reported C.M.'s friends attacked her, I. Baez noted that C.M.'s anger was getting worse and was at the point of being explosive and uncontrollable. R. 315. She had inconsistent school attendance and was not passing the seventh grade, and inconsistently took her medications. Id.

In June 2016, the month Plaintiff applied for SSI, C.M. was discharged from Astor because she had transferred schools and would be transferring to a clinic in Manhattan. R. 430–31. Her discharge summary noted that C.M. was "engaged when she attended treatment but she was inconsistent with her attendance." Id. It noted that her course of treatment was intended to help decrease her defiance toward authority figures and increase school attendance and feelings of anger. Id. It noted that C.M. was not allowed to return to her prior school. R. 431.

### 2. Upper Manhattan Mental Health Center

In September 2016, C.M. began seeing psychiatrist Dr. Lorena Grullon-Figueroa at Upper Manhattan Mental Health Center, Inc. R. 340. C.M. reported mood swings, crying, feeling isolated, yelling and breaking things, being easily annoyed, having a poor tolerance for frustration, poor academic performance, frequent irritability, and frequent thoughts of her murdered father figure. Id. C.M. also noted that her older brother had provided support, but he was now incarcerated. R. 342.

Dr. Grullon-Figueroa noted that C.M. was prescribed Seroquel, risperidone, clonidine, and melatonin, but that she was non-compliant with her medication and treatment. R. 340, 349. She showed poor academic performance, poor and aggressive interactions with peers, and poor interaction with authority figures, but with some limited positive peer relationships. R. 343. On a

mental status exam, C.M. showed cooperative behavior, clear speech, constricted affect, sad

mood, and impulse control. R. 346–47. Dr. Grullon-Figueroa diagnosed her with disruptive

mood dysregulation disorder and conduct disorder. R. 348. In October, November, and

December 2016, Dr. Grullon-Figueroa noted C.M.'s continued sleeping problems and found her

to be superficially cooperative with limited eye contact, low speech production, and a constricted

affect. R. 336, 381–84. In November 2016, C.M. agreed to increase her Seroquel dosage. R. 381.

A year later, in December 2017, C.M. returned to Upper Manhattan Mental Health, with

her intake assessment noting that her previous treatment case had been closed for non-

compliance. R. 349. She reported feeling tired during school, that she forgot what she learned,

felt frustrated when she did not understand something, had failing grades in the majority of her

classes, and walked out of class to roam the hallways when she became upset or frustrated.

R. 353. She reported recurring thoughts of her father figure and having friends at school who

would say that she was "caring and nice." Id.

Licensed clinical social worker Virginia Statler reported that C.M. was soft spoken and

calm throughout the intake interview, with clear, spontaneous speech, a full range affect, sad

mood, coherent thought process, no evidence of delusions, impaired judgment, poor impulse

control, and no suicidal ideation. R. 356–57. She found that C.M. was struggling with major loss

and her father's rejection, which manifested as outward anger due to her inability to verbalize her

inner pain. R. 360. She diagnosed C.M. with disruptive mood dysregulation disorder and

scheduled a follow-up psychiatric evaluation with Dr. Manuel Mosquera. Id.

On December 23, 2017, Dr. Mosquera noted that C.M. reportedly broke doors, cursed,

refused to attend school, had no respect for authority, and had been arrested for throwing things

at the police. R. 368. Upon examination, Dr. Mosquera found that C.M. had poor concentration

and immediate recall, low school performance, and that her calculation ability was untested as she could not complete the task. R. 371. She had poor impulse control, insight, and judgment. Id. Dr. Mosquera diagnosed C.M. with disruptive mood dysregulation disorder and abandonment issues. R. 372. He made similar findings in January and March 2018. R. 362, 390.

### 3.  Dr. Clotilde B. Peña

Dr. Peña was C.M.'s primary care provider since in March 2013. R. 396. On December 10, 2015, Dr. Peña noted that C.M. was diagnosed with bipolar disorder, with the most recent episode unspecified. R. 395. On March 1, 2016, Dr. Peña noted another mixed episode of bipolar and noted speaking with Plaintiff about C.M.'s bipolar three weeks later. Id.

On May 19, 2016, Dr. Peña treated C.M. for head injuries, noting prior treatment at St. Barnabas Hospital for those injuries after she was assaulted by a "school gang," and noted that she was bullied and cyberbullied by the same gang, and that Plaintiff was requesting a school transfer. R. 393, 395. On September 22, 2016, Dr. Peña noted that C.M. suffered another unspecified episode of bipolar disorder, as well as a migraine. R. 395. On December 29, 2016, C.M. was treated for right shoulder pain. Id. In February 2018, she was treated for acute shoulder pain with a history of popping, leading to a lack of strength in the limb, and back pain from scoliosis. R. 396. Dr. Peña referred C.M. to an orthopedist, who treated her shoulder pain in April 2016 and opined that she should not lift anything heavy. R. 554–55.

### E.  Medical Opinion Evidence

### 1.  Dr. Lorena Grullon-Figueroa

In October 2016, Dr. Grullon-Figueroa partially completed an impairment questionnaire, writing that she treated C.M. once per week beginning in September 2016 and that she was

diagnosed with "other persistent mood (affective) disorders" and "conduct disorder, adolescent-onset type." The remainder of the form was blank with a reference to attached notes. R. 336–39.

### 2. Dr. A. Chapman

In July 2016, a state agency medical consultant, Dr. Chapman, reviewed the available records and assessed C.M.'s limitations in six domains of childhood functioning. R. 74–76. Dr. Chapman stated that C.M. had two severe impairments—affective disorder and oppositional defiant disorder—and opined that those impairments did not meet or equal a Listing. R. 74. Dr. Chapman noted that C.M. had multiple stressors, academic underachievement, difficulty with authority figures, anger outbursts, talked back, cursed, made negative comments, slammed doors, and punched walls, but that her IEP showed that she was a leader who was liked by her peers and had many friends. R. 75. Dr. Chapman opined that she had only a marked limitation in interacting and relating with others. Id.

Additionally, Dr. Chapman opined that C.M. had less-than-marked limitations in the domains of acquiring and using information, attending to and completing tasks, and caring for oneself, citing evidence that she reported symptoms of depression and was able to care for herself throughout the school day, travel independently between classes, meet her daily living skills similar to same-age peers, receive testing accommodations allowing extra time on exams, and had IQ testing showing that she was "below average academically but higher potential is suspected." R. 74–76.

**III.    The ALJ's Decision**

On August 15, 2018, the ALJ denied Plaintiff's application. R. 7–26. As a preliminary

matter, she determined that C.M. was a school-aged child as of the date of her application and

was currently defined as an adolescent under the regulations. See R. 13; 20 C.F.R. §

416.926A(g)(2).

At step one, the ALJ determined that C.M. was not engaged in substantial gainful

activity. R. 13. At step two, she determined C.M. to have the following severe impairments: (i)

adjustment disorder; (ii) oppositional defiance disorder ("ODD"); (iii) disruptive mood disorder;

(iv) conduct disorder; (v) mood disorder; (vi) drug abuse dependence; and (vii) bipolar disorder.

Id. She also discussed C.M.'s shoulder injury and shoulder pain but found no persistent

symptoms or more than minimal limitations, and accordingly were non-severe. Id.

At step three, the ALJ found that C.M. did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the impairments listed in the

regulations ("Listings"). R. 14. Considering Listing 112.04 (Depressive, Bipolar, and Related

Disorders), the ALJ recounted the Listing criteria, and found that C.M. did not have one extreme

limitation, or two or more marked limitations in one of the areas of mental functioning required

under the Listing, and proceeded to discuss the record, C.M.'s test scores, and supplemental

medical literature. Id. The ALJ proceeded through a similar recounting of the Listing 112.05

requirements and found that although C.M. had an IQ score of 42, thus qualifying under the first

Listing criteria, the record showed that that score "should be interpreted with caution because

higher potential was suspected." R. 14.

The ALJ also determined that C.M. did not have one extreme or two or more marked

limitations in the six domains of childhood functioning. R. 15–26. She found that C.M. had a less

than marked limitation in acquiring and using new information; a less than marked limitation in attending and completing tasks; a marked limitation in interacting and relating with others; no limitation in moving or manipulating objects; a less than marked limitation in her ability to care for herself; and no limitation in her health and physical well-being. R. 15–25. Accordingly, she determined that C.M. was not disabled under the Act. R. 26.

## IV.     The Appeals Council's Determination

On May 25, 2019, the Appeals Council denied Plaintiff's request to review the ALJ's decision, making it the final agency decision for purposes of this Court's review. <u>See</u> R. 1–6.

## DISCUSSION

## I.      Standard of Review

In reviewing a denial of disability benefits by the Commissioner, the Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Because the Court's factual review is limited to the administrative record, judgment on the pleadings is an appropriate vehicle for review of the Commissioner's disability determination. <u>See</u> <u>Sellers v. M.C. Floor Crafters Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988) (holding that judgment on the pleadings "is appropriate . . . where a judgment on the merits is possible merely by considering the contents of the pleadings"); <u>see</u> Fed. R. Civ. P. 12(c). Judgment should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." <u>Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537</u>, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam).

An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by substantial evidence. <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999) (quoting

Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (cleaned up). If the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if it also supports the plaintiff's position. See Brault v. Soc. Sec. Admin., 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." (cleaned up)). Although deferential to the ALJ's findings, a decision must be reversed or remanded if it contains legal error or is not supported by substantial evidence. See Rosa, 168 F.3d at 77.

## II. Determining Whether a Child is Disabled Under the Act

The SSI program provides benefits to disabled individuals who meet specified income and resource limitations. 42 U.S.C. § 1381. For a child under the age of eighteen to qualify for disability benefits, they must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner must proceed through a three-step inquiry to make this determination:

(1) First, determine if the child is engaged in any substantial gainful activity. 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b). If not, then

(2) Determine whether the child has a severe impairment. Under the applicable regulations, an impairment or combination of impairments that causes more than minimal functional limitations is considered "severe." 20 C.F.R. § 416.924(c). If the child is found to be severely impaired, then

(3) Determine whether the impairment or combination of impairments is at a level of severity that meets, medically equals, or functionally equals the criteria of an impairment listed in Appendix 1 of the regulations to the Act ("Listing"). 20 C.F.R. § 416.924(d).

If the child's impairment meets or medically equals the requisite level of severity, the child will be found disabled as a matter of law. 20 C.F.R. § 416.924(d)(1). To determine whether a severe impairment is functionally equivalent to any given Listing, the Commissioner must consider how the impairment impacts the child's functioning in six domains, which are "intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A child's functional limitations within the six domains are evaluated by comparing how appropriately, effectively, and independently a child performs their activities as compared to other children of the same age without impairments. 20 C.F.R. § 416.926a(b). The child's impairment or impairments will be considered functionally equivalent to a Listing if they have "marked" limitations in at least two domains of functioning, or an "extreme" limitation in at least one domain. 20 C.F.R. §§ 416.926a(a), 416.926a(d). A limitation is considered "marked" when it interferes *seriously* with the child's ability to independently initiate, sustain, or complete activities, whereas it is "extreme" when it interferes *very seriously* with those same metrics. 20 C.F.R. §§ 416.926a(e)(2), (e)(3). Accordingly, if the child's impairment functionally equals the requisite levels of severity and duration, the child will be found disabled. 20 C.F.R.

22

§ 416.924(d)(1); <u>Malave o/b/o J.A.R.M. v. Comm'r of Soc. Sec.</u>, No. 16-cv-04596 (LAP)

(KHP), 2017 WL 11408393, at *12 (S.D.N.Y. July 26, 2017), <u>report & recommendation adopted</u>

2019 WL 4054014 (S.D.N.Y. Aug. 28, 2019).

## III.   Application

Plaintiff argues that the ALJ's decision contained legal error and was not supported by

substantial evidence. First, she argues that the ALJ erred in finding that C.M.'s impairments did

not meet or medically equal Listings 112.04 and 112.05. Second, she argues that the ALJ erred in

finding that C.M.'s impairments did not functionally equal the Listings when evaluating her in

the six domains of childhood functioning. The Commissioner argues that the ALJ's decision was

free of errors and supported by substantial evidence, and thus should be affirmed. The Court

proceeds through these arguments in turn. As a preliminary matter, Plaintiff does not contest the

ALJ's findings at steps one and two, which are supported by substantial evidence, and therefore

require no further review.

### A. The ALJ's Determination that C.M.'s Impairments Did Not Meet or Equal the Listings

#### 1.   Listing 112.04

Plaintiff argues that the ALJ erred by finding that C.M.'s impairments did not meet the

requirements of Listing 112.04 (Depressive, bipolar and related disorders), which requires a

showing of A and B, or A and C:

> A.  Medical documentation of the requirements of paragraph 1, 2, or 3:
>   1.  Depressive disorder, characterized by five or more of the following:
>       a.  Depressed or irritable mood;
>       b.  Diminished interest in almost all activities;
>       c.  Appetite disturbance with change in weight (or a failure to achieve an expected weight gain);
>       d.  Sleep disturbance;
>       e.  Observable psychomotor agitation or retardation;
>       f.  Decreased energy;

    g.  Feelings of guilt or worthlessness;
    h.  Difficulty concentrating or thinking; or
    i.  Thoughts of suicide

2.  . . .

    .            .            .

3.  Disruptive mood dysregulation disorder, beginning prior to age 10,
    and all of the following:
    a.  Persistent, significant irritability or anger;
    b.  Frequent, developmentally inconsistent temper outbursts;
       and
    c.  Frequent aggressive or destructive behavior.

AND

B.  Extreme limitation of one, or marked limitation of two, of the following
    areas of mental functioning:
    1.  Understand, remember, or apply information.
    2.  Interact with others.
    3.  Concentrate, persist, or maintain pace.
    4.  Adapt or manage oneself.
C.  . . . .

See 20 C.F.R. Pt. 404, Sub. P, App'x 1, pt. B2 [hereinafter "List."] § 112.04 (internal citations

omitted).

    The ALJ determined that C.M. did not meeting Listing 112.04 because she did not have

an extreme limitation in one or marked limitation in two domains of mental functioning under

Listing 112.04 paragraph (B), but the decision did not discuss which (if any) of the Listing

112.04 paragraph (A) criteria the ALJ considered in making the determination. See R. 14.

Plaintiff argues that C.M.'s impairments would qualify under both (A)(1) (depressive disorder)

and (A)(3) (disruptive mood dysregulation disorder). Accordingly, the Court addresses those

criteria first before proceeding to the ALJ's determinations under paragraph (B).

### i.  C.M.'s Impairments Evaluated Under Listing 112.04 (A)(1)

    Plaintiff argues that C.M. meets each of the Listing 112.04 (A)(1) criteria. First, C.M.

was indeed diagnosed with moderately severe depression; symptoms of depression; and tested in

the 97th percentile for withdrawal and depression, meeting the primary criteria. See, e.g., R. 447. Next, the record shows that she was irritable, and had sleep disturbances, decreased energy, difficulty concentrating, and thoughts of death or suicide, and that testing showed an elevated suicide risk—meeting at least five of the sub-criteria. See, e.g., R. 49–50, 63, 274–75, 278, 281, 294, 349, 353, 371, 379, 384, 434, 447, 455–56, 459, 468, 478, 505, 510–11, 520. As such, substantial evidence would have supported a finding that C.M. met section (A)(1) of the Listing.

### ii.   C.M.'s Impairments Evaluated Under Listing 112.04 (A)(3)

Additionally, Plaintiff argues that C.M. would medically equal the 112.04 (A)(3) criteria. She claims that although C.M. was diagnosed with disruptive mood dysregulation disorder ("DMDD") after age 10—and therefore not qualified under the Listing—the record contains substantial evidence that she met all of the other criteria: she had persistent irritability or anger, frequent developmentally-inconsistent temper outbursts, and frequent aggressive and destructive behaviors. See, e.g., 53–54, 64–65, 222–23, 291, 401.

Although the Court agrees that the record shows that C.M. meets all the necessary 112.04 (A)(3) sub-criteria, it would be improper to find that C.M.'s impairments were medically equivalent to the Listing by simply reading out its main criteria—the age of diagnosis. Indeed, it appears that there is a distinction between childhood-onset DMDD and its symptoms and those of an adolescent. See Disruptive Mood Dysregulation Disorder: The Basics, Nat'l Inst. of Mental Health (noting that "[y]outh with DMDD are diagnosed between the ages of 6 and 10" and that symptoms of DMDD change in adolescence and young adulthood).[10] Accordingly, substantial evidence does not support a finding that C.M. met or medically-equaled the 112.04 (A)(3)

---

[10] Available at https://www.nimh.nih.gov/health/publications/disruptive-mood-dysregulation-disorder/index.shtml#pub5. I. Baez opined that C.M.'s conduct disorders were of the "adolescent-onset type." R. 336.

criteria. Because a finding could be made under 112.04(A)(1), however, it is appropriate to proceed to the next Listing criterion.

### iii.  C.M.'s Impairments Evaluated Under Listing 112.04 (B)

The ALJ determined that C.M. did not meet the Listing 112.04 (B) criteria because she did not have one extreme limitation, or two marked limitations, in an area of mental functioning described in the Listing criteria. See R. 14. It is not self-evident from the ALJ's discussion, however, how the evidence she examined related to the Listing criteria aside from the area of understanding, remembering, or applying information. Indeed, the ALJ references the subsequent portion of her opinion, noting "[a]s discussed in details below, the claimant does not have one extreme limitation or two marked limitations in the domains." Id. Yet the regulations make clear that the criteria evaluated under Listing 112.04 (B) are not the same of those evaluated under the domains of childhood functioning. Compare List. § 112.04 (B) (evaluating "marked" or "extreme" limitations in the *four areas of mental functioning*, including (i) understanding, remembering, or applying information; (ii) interacting with others; (iii) concentrating, persisting, or maintaining pace; and (iv) adapting and managing oneself), with 20 C.F.R. § 416.926a (evaluating "marked" or "extreme" limitations in the *six domains of childhood functioning*, including (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being).

Although there is some overlap between the areas of mental functioning and the six domains, there are critical distinctions that could have changed the ALJ's evaluation of C.M.'s

eligibility.[11] This is especially evident when considering the additional guidance provided in the Listing that provides several examples under each sub-criteria, such as the examples under (B)(1) "using reason and judgment to make decisions"—a skill that C.M.'s therapists, psychiatrists, and teachers consistently noted she lacked. See Listing § 112.00 (E) (defining section (B) criteria); see, e.g., R. 296 (Dr. Kessler noting her "moderately impaired ability to make reasonable decisions"); R. 473 (Dr. Tambini noting same); R. 371 (Dr. Mosquera noting her "poor insight" and "poor judgment"); R. 222 (teacher noting that C.M. appeared "immune" to understanding the consequences of her behaviors).

In considering the (B)(2) criteria, the Court notes that the record is replete with examples that showed that C.M.'s behaviors were contrary to the examples given in the Listing regarding relating to others appropriately, such as "handling conflicts with others," "understanding and responding to social cues," "responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." List. § 112.0 (E)(2); see, e.g., R. 222–23 (reporting that C.M. cursed and threatened peers and teachers, hit a student, was disruptive, threw objects, punched doors, kicked chairs).

The same is true of (B)(3) and (B)(4) criteria. Compare List. § 112.00 (E)(3) ("[C]ompleting tasks in a timely manner; ignoring or avoiding distractions while engaged in an activity or task; changing activities without being disruptive . . . sustaining an ordinary routine and regular attendance at school . . . ."), and List. § 112.00 (E)(4) (appropriately "[r]esponding to demands . . . distinguishing between acceptable and unacceptable performance in community- or

---

[11] Indeed, it would be redundant for the inquiry under the Listing criteria to be interchangeable with the functional equivalence criteria because finding that a child did not meet a Listing would effectively rule out functional equivalence automatically.

school-related activities"), with R. 185 (failing to complete tasks or chores), R. 362 (failing to complete work), R. 371 (failing to complete assessment), R. 260 (noting that C.M. had difficulty remaining on task for ten minutes), R. 219 (noting C.M. would leave class to avoid difficult tasks), R. 46 (estimating 80 school absences), and R. 222 (failing classes due to sporadic attendance).

Moreover, the Listings make clear that a limitation finding under section 112.04 (B) was meant to reflect "the overall degree to which your mental disorder interferes with that area," and that "the greatest degree of limitation of *any part* of the area of mental functioning directs the rating of limitation of that whole area of mental functioning." List. §§ 112.00 (F)(c), (e) (emphasis added). Accordingly, under the regulations, if the ALJ found that C.M. had no limitation in understanding and applying information, but a marked limitation in remembering information, she would be obligated to find a marked limitation under (B)(1). This alone suggests that the ALJ misapplied the standards from the six domains of childhood functioning in place of the four areas of mental functioning because the decision suggests that she 'averaged' or 'cancelled out' C.M.'s different limitations and abilities, as opposed to affording "the greatest degree of limitation" to the whole area of mental functioning." List. § 112.00 (F)(c), (e).

Accordingly, the Court finds that the ALJ erred in misapplying the Listing 112.04 (B) standards. Because substantial evidence could support a finding that C.M. met or medically equaled Listing 112.04 §§ (A)(1) and (B)(1)—and thus would qualify as disabled as a matter of law—the error was not harmless and remand is appropriate for a proper examination of the record under the correct standard.

### 2. **Listing 112.05**

Next, Plaintiff argues that the ALJ erred by finding that C.M.'s impairments did not meet

the requirements of Listing 112.05 (Intellectual disorder), Section B, requiring a showing of:

B. Satisfied by 1 and 2:

1. Significantly subaverage general intellectual functioning evidenced by a or b:
   (a) A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of generalized intelligence; or
   (b) A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
   a. Understand, remember, or apply information; or
   b. Interact with others; or
   c. Concentrate, persist, or maintain pace; or
   d. Adapt or manage oneself.

Listing § 112.05 (internal citations omitted).

The ALJ found that C.M. did not qualify under Listing 112.05 (B)(1) because, although

she had a full scale IQ score of 42, "the examining psychologist indicated that the claimant did

not appear to put forth effort in her responses" and therefore "the results of the assessment were

not deemed to be a true reflection of her abilities." R. 14–15. Plaintiff concedes that M. Baez

noted that C.M.'s results should be interpreted with caution, yet she argues that that M. Baez did

not suggest that C.M.'s IQ was *above* 70. Indeed, Plaintiff argues that the confidence interval on

C.M.'s IQ test was from 39–50, meaning that there was a 95% chance that, if tested again, C.M.

would fall within that range, well below the threshold score to meet the Listing. R. 252. And

even with her caution, M. Baez determined that C.M. "meets the eligibility requirements for a

Student with a disability." Id. Accordingly, Plaintiff argues that the ALJ was obliged to develop

the record to show that C.M.'s full scale IQ was not below 70 (Listing 112.05 (B)(1)(a)), or not

below 75, with a 70 verbal score (Listing 112.05 (B)(1)(b)).

The Commissioner counters that it was appropriate for the ALJ to reject C.M.'s IQ score

based upon M. Baez's notes alone, and that Plaintiff is mistaken about the significance of the test

score confidence interval. Taking up the second point first, the Court concurs with the

Commissioner—the confidence interval derived from C.M.'s test results would suffer from the

same problems as the test score itself because the examiner indicated that she believed C.M. may

not have put forth her full efforts. See R. 250. Plaintiff's argument is unpersuasive.

To the first point, the Listings state that an ALJ must "generally presume that your

obtained IQ score(s) is an accurate reflection of your general intellectual functioning, unless

evidence in the record suggests otherwise." List. § 112.00 (H)(2)(d) (describing the process for

establishing significantly subaverage general intellectual functioning). They specify further that a

"statement from the test administrator indicating that your obtained score is not an accurate

reflection of your general intellectual function" qualifies as evidence against that presumption,

but that a determination that the score is not accurate must also be supported "by appropriate

clinical and laboratory diagnostic techniques," as well as "relevant evidence in the case record."

Id.

M. Baez cautioned throughout her assessment that C.M.'s IQ score "should be interpreted

with caution because higher potential is suspected," citing teacher reports that C.M. had "enough

skills to produce grade level work, as evidenced during summer school." R. 252. Her conclusion

that the score was should be interpreted with caution was supported by both relevant evidence in

the record (such as the teacher reports cited by M. Baez) *and* "appropriate clinical and laboratory

diagnostic techniques." List. § 112.00 (H)(2)(d). The record shows that, aside from teacher reports, M. Baez relied upon her "[c]linical observations made during the testing period" to note that C.M.'s "ability to sustain attention, concentration, and effort" may have affected her scores. List. § 112.00 (H)(2)(d)(iv); see R. 244–52. Accordingly, the ALJ was entitled to rely upon M. Baez's statements to weigh against the score's presumptive accuracy.

Importantly, although M. Baez recommended caution in interpreting the test results, she did not reject them outright. Indeed, C.M.'s other diagnostic scores on the KTEA-3 found that her written expression abilities were very low; her math skills and reading comprehension was low; and her reading and spelling abilities were below average, though subject to similar cautioning. R. 252. The Commissioner cites other evidence in the record in support of the conclusion that C.M.'s IQ scores may not have been an accurate reflection of her abilities, including notes by Dr. Chapman, who did not personally evaluate C.M., but relied upon M. Baez's notes to conclude that C.M.'s IQ score was "deemed not a valid estimate of her cognitive abilities." R. 75. This additional record evidence does not rise to the standard in the Listings.

The Commissioner also overstates the significance of some of C.M.'s teachers' reports by arguing that they showed that C.M. had the requisite ability to perform and only underachieved because of her behavioral and emotional disturbances. But that is not entirely accurate—C.M.'s IEPs, especially as time went by, contained several notes indicating that "it is often difficult to assess her capabilities" because of her behavioral issues, or a "belief" that her behavior affected her ability to perform. R. 223. Such notes might call into question C.M.'s extremely low IQ score—but they certainly cannot be construed as contradictory measurements of her abilities.

Given the remaining uncertainty about C.M.'s abilities, along with substantial evidence suggesting that although her IQ may not have been so low that it could have been below 75, it

would have been appropriate for the ALJ to develop the record on this particular issue before determining that C.M. did not meet the Listing criteria. See 20 C.F.R. §§ 416.912, 416.920b (noting that if there is inconsistent or insufficient evidence, the ALJ "*may* recontact your medical source," "*may* request additional existing evidence," "*may* ask you to undergo a consultative examination," "*may* ask you or others for more information," but ultimately is entitled, without additional evidence, to "make a determination or decision based on the evidence we have") (emphasis added).

Plaintiff argues that the ALJ was obligated to develop the record based upon this ambiguity, but this argument relies upon an inaccurate or outdated reading of the regulations. First, Plaintiff's argument rests upon several authorities that addressed the ALJ's duty to develop the record under the treating physician rule—not a generalized duty to develop the record. For example, Plaintiff cites Selian v. Astrue for the proposition that "to the extent that the record is unclear, the Commissioner has an affirmative duty to fill any clear gaps in the administrative record." 708 F. 3d 409, 420 (2d Cir. 2013) (cleaned up). But that quote ends "before rejecting a *treating physician's diagnosis*." Id. (emphasis added). Furthermore, the other cases upon which Plaintiff relies cite to a now-amended portion of the regulations that previously stated that an ALJ "*will*" recontact the medical course and "*will*" seek additional evidence or clarification from medical sources if the evidence "contains a conflict or ambiguity that must be resolved," which has since been removed. See 20 C.F.R. § 416.912 (effective through Nov. 11, 2010) (emphasis added); Lowry v. Astrue, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (noting the amendment).

Because the ALJ chose not to further develop the record to help clarify C.M.'s IQ, it is difficult to determine why the ALJ made a finding that C.M.'s IQ was not only above 42, but also above 70–75—a finding for which there is no substantial evidence in the record.

Accordingly, it appears that even given M. Baez's note of caution, the ALJ substituted her own judgment over the only objective evidence available that bore on the measure of C.M.'s IQ directly. See, e.g., Rose v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) ("An ALJ may not arbitrarily substitute his own judgment for competent medical opinion." (quotation omitted)); Ostrom v. Comm'r of Soc. Sec., No. 7:14-cv-00268 (MAD) (ATB), 2015 WL 1735097, at *4 (N.D.N.Y. Apr. 16, 2015) (finding that an ALJ "improperly substituted her own judgment for competent medical evidence" by making clinical and diagnostic findings outside of the medical examiner's determinations).

Therefore, the Court finds that remand is appropriate for the ALJ to reconsider C.M.'s IQ and should supplement the record with the evidence necessary to support her findings. Because the inquiry under Listing 112.05 (B)(2) is identical to that under Listing 112.04 (B), and the Court has already found that remand is appropriate to evaluate the Paragraph (B) criteria, the ALJ should apply the same assessment here.

### B.  Plaintiff's Remaining Arguments

As indicated above, Plaintiff argues that the ALJ's findings as to the six domains of childhood functioning were not supported by substantial evidence. The Court declines to reach these arguments, however, because remand is already necessary. See, e.g., Morales v. Colvin, No. 13-cv-06844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (passing on arguments regarding the ALJ's factual determinations "given that the ALJ's analysis may change on these points upon remand"), report & recommendation adopted 2015 WL 213776 (S.D.N.Y. May 4, 2015); Briggs v. Saul, No. 19-cv-09776 (SLC), 2021 WL 796032, at *19 (S.D.N.Y. Feb. 26, 2021) (same).

Briefly, however, the Court notes that both the ALJ's decision and the Commissioner's briefs cite repeatedly and place great significance on M. Baez's finding that C.M. worked at an appropriate grade level during her sixth-grade summer, in 2015. See, e.g., R. 20 (ALJ finding, after a paragraph describing C.M.'s present difficulties in reading, writing, math, and memory, that there was a less than marked limitation because "in summer school, she was able to keep the pace of her same peers and did well academically"); ECF No. 24 at 10 ("Plaintiff scored low on assessments of math and reading, and did 'little to no work unless encouraged to do so,' but '[w]hen in summer school [she] was able to keep with the pace of her same age peers and did well both academically and socially.'"). Yet any assessment regarding her performance in sixth grade summer school ignored the same-source evidence that C.M.'s performance deteriorated from that point forward. See, e.g., R. 245 (report by M. Baez that beginning in November of C.M.'s seventh grade year, her "behavior and academic performance substantially changed").

The Court of Appeals and other circuit courts have made clear that administrative "cherry picking" of relevant evidence—crediting only that evidence which supports a specific administrative finding, while rejecting conflicting same-source evidence—should be viewed with skepticism. Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983)); see also Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011). Such a selective or incomplete recounting by the ALJ "can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." Younes v. Colvin, No. 14-cv-00170 (DNH) (ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (citing Gernier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010)). Upon remand, the ALJ should bear in mind the progressive nature of C.M.'s impairments, and that the records of her performance in sixth grade summer school were not probative of her symptoms throughout the

34

applicable period. Based upon the remaining record, there may not be substantial evidence to support a denial of benefits.

## CONCLUSION

Plaintiff's motion is GRANTED, and the Commissioner's motion is DENIED. The matter is REMANDED to the ALJ for proceedings consistent with this Opinion. Given C.M.'s age, and the time that has elapsed since Plaintiff first filed for benefits in 2016, "[f]urther proceedings on remand should be promptly dispatched." Montano v. Barnhart, No. 01-cv-10710 (AKH), 2003 WL 749527, at *6 (S.D.N.Y. Mar. 5, 2003). Within 30 days of the entry of this Order, Plaintiff's counsel shall file any request for attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated:  March 31, 2021
          New York, New York